## In re MAHONEY.

(*Supreme Court, General Term, Second Department.* December 10, 1890.)

1. WILLS—TESTAMENTARY CAPACITY—EVIDENCE.

During a considerable time before the execution of his will, testator had been seriously ill, and, immediately before its execution, he had fainted and lost consciousness for a short time through feeble action of the heart. On recovering, he slept, and awoke much refreshed. The will, previously prepared, was then produced by his physician, and testator, sitting up in bed, without assistance, read the will, and expressed his satisfaction with it; and, in the presence of the physician and nurse, he signed the will, and requested them to sign as witnesses, which they did. On the day following he spoke to others of the disposition made of his property, expressing his satisfaction with it. The will was natural, under the circumstances, and in accordance with his previously expressed intentions. The testimony of the physician and nurse, who were with testator constantly, and who were entirely disinterested, was clear, and showed him to have been in full possession of all his mental faculties, and was corroborated by others. Some of the witnesses testified that testator was flighty at times, and had mental aberration, but this evidence did not apply to the time of making the will. *Held,* that his testamentary capacity was abundantly established.

2. SAME—UNDUE INFLUENCE.

The will was prepared, without direction from him, in accordance with his intentions previously communicated to the person who procured it to be drawn, and was delivered by such person to another, with instructions to give it to some disinterested person to present it to testator for execution, if it met his wishes. It was given to his physician, and was by him presented to testator. Testator's relatives had been requested, before its execution, to leave the room, in order that testator might obtain needed sleep. After the execution of the will, they returned, and he conversed with them all. The physician and nurse were entirely disinterested, and no interested person spoke with testator on the subject; and the circumstances showed that there was no preconceived purpose, in preparing the will, to forestall his testamentary intention. *Held,* that there was no proof of undue influence.

Appeal from surrogate's court, Kings county.

Petition for probate of the will of Peter Paul Mahoney, by Edward D. Farrell, an executor named therein. From a decree refusing probate, the proponent appeals.

Argued before BARNARD, P. J., and DYKMAN and PRATT, JJ.

*Frederick Smyth,* (*David McClure,* of counsel,) for appellant. *Patrick Keady,* for respondents.

DYKMAN, J. Peter Paul Mahoney, a representative in congress from the city of Brooklyn, died at the Arlington Hotel, in the city of Washington, on the 27th day of March, leaving a last will and testament, which was offered for probate to the surrogate of Kings county, and rejected, and the case comes to us on an appeal from his decree. For some time previous to his death, the deceased was afflicted with fatty degeneration of the heart, and *gastre enterico*

*catarrh,* from which he became quite ill, the forepart of March, and, on the 19th day of March, his wife, who was with him, telegraphed to his relatives, and they went on to see him. The history of the will is this: Edward D. Farrell, the brother-in-law of the deceased, reached Washington on the afternoon of the 20th day of March, called upon a lawyer of that city for the purpose of procuring his attendance at the hotel to see Mahoney, and draw his will, and the lawyer suggested that he could draw the will without seeing Mahoney, if Farrell knew his desire and intention respecting the disposition of his property. Farrell had conversed with Mahoney previously upon the subject, and Mahoney had communicated to him his intention to leave all his property to his wife, and Farrell informed the lawyer of such intention, and he thereupon drew the will in question, and delivered it to Farrell, who gave it to Mrs. Brennan, with instructions to give it to some disinterested person, with direction to present it to Mahoney for execution if it met his wishes. Mrs. Brennan delivered the paper to the physician in charge, with directions to show it to Mahoney if he became rational. That was after 8 o'clock in the evening, and Mahoney was in a fainting or sinking condition from the disease of his heart. He recovered from that condition, and then all the friends were requested to leave the room to enable the patient to secure repose and sleep. Only the physician and the nurse remained in the room, and when he awoke he was refreshed, and perfectly rational, and then the doctor told him he was in a very critical condition, and might die, and asked him if he had made a will, and he said no. Then the doctor asked him if he wished to make a will, and his answer was, "I do." The doctor then took out the paper, and told him it had been handed to him by Mrs. Brennan for him to look at it and see if it was what he wanted. Then the doctor read the will, and Mahoney said, "That is what I want," or words to that effect. No one was then in the room but the doctor and the nurse. After the doctor read the paper to him he took it in his hand, and read it himself, and called for pen and ink, and signed it; and, after it was signed, the doctor read it to him again, and he said that was his wish. The doctor told him the will left everything to his wife, and asked him if he understood it thoroughly, and he said, "I do; who else should I leave it to?" Then he said, "That is my will; you witness it, doctor," and then he said, "Now, you sign it, Barton," and then the doctor and the nurse signed the will as witnesses at Mahoney's request, and in his presence, and while both were present, and they both testify that Mahoney was perfectly rational, and of sound mind at that time. That was between 11 and 12 o'clock at night, and then the door was opened, and the friends went into the room to see Mahoney, and he conversed with them in his usual manner, and so far as we have the conversation it was entirely natural. About 10 o'clock in the morning of the 21st, the morning after the execution of the will, Dr. Sowers, the principal physician, called and held the following conversation with Mahoney: "Dr. Sowers said: 'Good morning, Mr. Mahoney; how do you feel this morning?' He said, 'I feel very well.' He said: 'I hear you have been busy last night making a will.' He said: 'Yes; I had a lively time last night; made a will.' Dr. Sowers said: 'Do you know what you did in that will? Did you read the will?' He said: 'I do.' He said: 'Do you know you left everything to your wife?' He said: 'Yes; who else should I leave it to?' He said: 'I am glad to see you so well and jolly.'" The foregoing is an extract from the testimony of the nurse who was present and heard the conversation, and Dr. Sowers gave substantially the same evidence, but some of it was stricken out by the surrogate. In the afternoon of the 21st, Margaret S. Watkins called at the room of Mahoney, and he informed her that he had made a will, and that Dr. Sowers said it required three witnesses, and requested her to sign the same as a witness. Thereupon Dr. Burwell produced the will, and read it, and Mrs. Watkins read it, and Mahoney said it was his will, and acknowl-

edged his signature, and she signed it as a witness at his request. The will was then again delivered to Dr. Burwell, and he retained it until the morning after the death of Mahoney, when he delivered it to Farrell.

The first thing to be said about this will is that it was legally executed. All the requirements of the law received compliance, and there are no technical reasons why it should not be admitted to probate. Some criticism is made respecting the signature, but it is entitled to no consideration. It was made by the testator, who intended to write his name, and he wrote it out in full. Whether that was his usual mode or not is immaterial. That was his name, and that is what he undertook to write. It was the writing of a sick man with a weak hand, but, so long as there is no dispute about its genuineness, its inelegance is quite immaterial.

The important question in the case has reference to the mental condition of the testator at the time of the execution of the will. The two witnesses who saw most of him are the attending physician and the nurse, for they were with him constantly. Their testimony is clear, concise, and consistent, and entirely disinterested, and, independent of their opinions, which were very decided, they show the man to have been entirely competent, and in the full possession of all his mental faculties and powers. That evidence is corroborated by the testimony of Mrs. Watkins, Charles S. Lewis, Mrs. Brennan, and Mr. and Mrs. Farrell. The testimony of Roessel and Cahill, if true, relates to days other than the 20th when the will was made. But the undisputed facts manifest the full mental capacity of the testator. He lost consciousness for a short time in the evening, as a result of the feeble action of his heart, and during that time all the friends were in his room, and when he recovered it was very desirable for him to obtain some sleep, and all the friends were requested to leave the room to enable him to do so. They all left accordingly, and he slept until after 11 o'clock, and when he awoke he was much refreshed, and said he felt all right, and had a good sleep, but felt weak. Then the doctor produced the will, and read it, and explained it. Then Mahoney sat up in the bed, without assistance, and read the will himself, and then signed it and published it in the manner already recited. He understood fully that he had given all his property to his wife, and expressed in emphatic language his intention and desire to do so. The next morning he went over the transaction with Dr. Sowers, and again said he knew he had given all his property to his wife, and expressed his satisfaction with the will. Again in the afternoon he republished his will in presence of Mrs. Watkins, and thus the testator, on three different occasions, with great deliberation, expressed the testamentary intention and disposition contained in his will, and the physician and the nurse and others say the testator was better from the night of the 20th after he was refreshed by sleep, for the next three or four days. Moreover, the will is entirely natural, and in accordance with his previously formed intention, as expressed to Mr. Farrell, his brother-in-law, on two different occasions. He had no child, and no father or mother, and his sisters were married and comfortable, and he desired his wife to have his property. If any imposition was practiced upon Mahoney in the procurement of this will, it could not fail of detection. After ample time for reflection, the matter was twice called to his attention when his mental condition was perfect, and on both occasions he gave it his full recognition and sanction; and, if he had been induced to execute the will against his wishes, he had ample opportunity to repudiate the transaction when all his friends came into the room immediately after the execution of the will, when the matter was fresh in his mind, and when he conversed with them all with intelligence and comprehension. The faintness and loss of consciousness of the testator furnished no indication of mental weakness. They resulted from the feeble action of the heart, and signified only the failure of that organ temporarily to perform its functions. The patient becomes insensible during such periods of heart failure, but, as soon

as the action of the heart is restored, sensibility returns, and he is immediately in the full possession of all his faculties. The decease of his heart and his catarrh had no tendency to impair his intellect. It is common knowledge that people with heart disease live through many severe experiences of prostration, during which they become unconscious, without any loss of mental capacity. Some of the witnesses testified that he was flighty at times, and had mental aberration, but the evidence did not apply to the time of the making of the will, and most of those symptoms were manifested two or three days after the execution of the will, for after that he continued to improve for three days, and then grew worse until he died.

Upon the trial before the surrogate, the counsel for the contestants examined Dr. Burwell and the nurse with much severity respecting their failure to call the friends of Mahoney into his room when he made his will, or to notify them of the fact that he was about to do so. Some of his questions bordered close to incivility. The point, however, was exceedingly frivolous. Instead of being proper, it would have been very improper and unusual to surround the testator with his relatives at such a time. The first thing to be done was to ascertain whether he desired to make a will, and he might determine not to do so, and it was important for him to be free and unmolested, and undisturbed and uninfluenced; and, if he decided to make a will, then the draft which the doctor held was to be presented to him for examination and consideration; and then again it was essential for him to be free from all embarrassment to enable him to concentrate his thoughts, and consider his relations to those who might have a claim upon his bounty, and to comprehend the effect and propriety of any testamentary disposition he desired to make of his property. It is usual, and it is well, for persons at such a time to be alone, and it was well for the testator to be alone and relieved from the presence of his relatives and his wife, and, instead of receiving censure or criticism, the physician should receive commendation and praise for the delicate, careful, and impartial manner in which he conducted the transaction throughout. Again, why should he have announced the fact to the friends of Mahoney? He had no injunction of secrecy, but such a notification would have been very injudicious and very extraordinary. There are many prudential reasons why people do not usually make their wills public previous to their death. Such publicity would subject them to solicitous importunity and censure, and, if we may judge from the manifestations of these contestants, this testator would have enjoyed no exemption from such experiences.

Upon the question of undue influence it is unnecessary to make any extended remarks, for there is an entire absence of proof to show any influence at all. No interested person even spoke with him respecting a will, and the two persons who were with him were as cold and indifferent as men could be, and neither of them spoke a word of persuasion or solicitation, but they left him to the exercise of his own volition, and the execution of his own design. The priest who administered the consolations of his church to the testator related a story which is as strange as it is unimportant. He said that, on a certain evening which he could not specify, he went into the room of Mahoney, and found two women on his bed, one on each side of him, holding him up with a paper before him which they besought him to sign, and which he refused to do; that he told them the paper would not stand, and that the nurse who was present said he was right; that there was a lady at the foot of the bed, and he leaves it to be inferred that the two ladies were Mrs. Farrell and Mrs. Brennan, and that the lady at the foot of the bed was Mahoney's wife. Two things we know; the occurrence did not take place on the night of the 20th, and the paper of which he spoke was not the will in question. The will was handed by Farrell to Mrs. Brennan, and by her delivered to Dr. Burwell while the testator was asleep on the evening of the 20th, and neither Mrs. Farrell, Mrs. Brennan, nor Mrs. Mahoney were in the room of the testator until after

the will was executed, and Dr. Burwell retained the will in his possession from that time until after Mahoney was dead. The nurse and all three of the ladies were called and testified as witnesses in the case, but they were not interrogated in respect to the transaction, and both parties seemed to treat the testimony with the charity of their silence, and it is entitled to no consideration, and has no influence in the case.

After a full and careful examination we find no reason for the overthrow of this will. The testamentary capacity of the testator at the time of its execution, and for several days thereafter, is abundantly established, and the absence of influence is plainly manifest. Neither the wife of the testator nor either of her relatives or friends even suggested a will. His wife was with him alone in Washington, with sufficient opportunity to solicit a will, or make an effort for its procurement; and, instead of doing so, she sent for his relatives, as well as her own, and there never was a time when his wife was admitted to his room and his sisters excluded. On the evening of the 20th, all persons were requested to leave the room, and the wife departed with the rest, and neither the wife nor her relatives enjoyed exemption from the general orders of the physician to exclude persons from the room at certain times. The preparation of the will, without the direction of the testator, has been assigned as a suspicious transaction, and, if any improper motive or design could be deduced from the fact, it would be so; but all the circumstances manifest the entire absence of any preconceived purpose on the part of Farrell to forestall the testamentary intention of Mahoney. The primary object of Farrell, when he called upon the lawyer, was to procure his attendance at the room of Mahoney to draw his will there, and it was not until the lawyer declared it unnecessary for him to see Mahoney, and that Farrell could furnish him with the information necessary to enable him to draw the will, if he knew the disposition Mahoney intended to make of his property, that Farrell gave the direction in accordance with the intention which Mahoney had expressed to him previously on two occasions. After the will was prepared and in the possession of Farrell, instead of presenting the same to Mahoney himself, and availing himself of the opportunity to exert any influence he might possess to procure its execution, Farrell gave it to Mrs. Brennan, with directions to her to deliver the same to some disinterested person for presentation to Mahoney at a proper time. He did not even select the person to whom it was to be so delivered, and made only the condition that such person should be disinterested. He did not even seek an interview with Mahoney before the will was presented to him for approval and execution. The connection of Farrell with the will is therefore deprived of all significance, and is even free from suspicion. The uncontroverted evidence, the reliable testimony, and all the circumstances satisfy us that the will is valid in all respects, and should be admitted to probate. The decree of the surrogate should therefore be reversed, with costs to the appellant against the contestants, and the will should be admitted to probate.